IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TAMMI L. G.,[1]                               )
                                              )
        Plaintiff,                            )
                                              )
vs.                                           )       Case No. 3:25-cv-29-DWD
                                              )
COMMISSIONER OF SOCIAL                        )
SECURITY,                                     )
                                              )
        Defendant.                            )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Under 42 U.S.C. § 405(g), Plaintiff seeks a judicial review of the final agency decision of Defendant, which denied her Disability Insurance Benefits ("DIBs"). For the reasons explained below, the Court **AFFIRMS** the final agency decision of Defendant.

## I. Procedural History

Plaintiff was born on June 6, 1968. (Doc. 10-2, pg. 30). She applied for DIBs on June 27, 2022, alleging a disability onset date of June 15, 2022. (Doc. 10-5, pgs. 2, 9). Plaintiff's alleged disability relates to major depressive disorder, generalized anxiety disorder, bipolar 1 disorder—manic depression, borderline personality disorder, and posttraumatic stress disorder. (Doc. 10-6, pg. 6). Plaintiff's application was denied on February 22, 2023, and again on reconsideration on Augst 29, 2023. (Doc. 10-4, pgs. 8-9, 14-15). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 8, 2024. (Doc. 10-2, pgs. 37-58). The ALJ issued an Unfavorable

---

[1]Plaintiff's full name will not be used due to privacy concerns.

Decision on July 8, 2024. (Doc. 10-2, pgs. 16-32). Plaintiff's request for an Appeals Council review was denied on November 15, 2024. (Doc. 10-2, pgs. 2-4). Plaintiff exhausted her administrative remedies; accordingly, the matter is now ripe for a judicial review.

## II. Generally Applicable Legal Principles

Plaintiff must be disabled in order to receive DIBs. To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. § 404.1520(a)(1), (4). The ALJ asks if Plaintiff: (1) is doing substantial gainful activity; (2) has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) has an impairment that meets or equals an impairment listed in the regulations and satisfies the duration requirements; (4) in view of her residual functional capacity ("RFC") and past relevant work, can perform past relevant work, which is work done within five years that was substantial gainful activity and lasted long enough for her to learn how to do it; and (5) in view of her RFC, age, education, and work experience, she can adjust to other work. *See id*. §§ 404.1520(a)(4)-(g); 404.1560(b)(1)(i).

If Plaintiff is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then she is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i),(ii), (iv), (v). If Plaintiff has an impairment meeting the requirements of step 3 or is incapable of adjusting to other work under step

5, then she is disabled. *See id*. § 404.1520(a)(4)(iii), (v).[2] Plaintiff has the burden of proof at steps 1 to 4. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, the burden of proof shifts to Defendant to show Plaintiff can adjust to other work existing in significant numbers in the economy. *See Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

Impairments and related symptoms, such as pain, may cause physical and mental limitations that affect the ability of Plaintiff to work. *See* 20 C.F.R. § 404.1545(a)(1). Steps 4 and 5 assess the most Plaintiff can do at work despite those limitations. *See id*.; *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). Accordingly, an RFC, which the ALJ completes after step 3 but before steps 4 and 5, assesses Plaintiff's ability to perform sustained physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and for five days a week or an equivalent work schedule. *Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on the relevant medical and other evidence contained in the record. *See* 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

In the RFC, the ALJ must identify Plaintiff's functional limitations and assess her work-related abilities on a function-by-function basis. *Tenhove*, 97 F. Supp. 2d at 569; SSR 96-8p, 1996 WL 374184, *1, 3; *accord Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1036 (E.D. Wisc. 2004). When doing so, the ALJ considers all impairments, including those that are

---

[2]At step 3, most mental impairment listings require at least two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See Thompson v. Saul*, 470 F. Supp. 3d 909, 912 (E.D. Wisc. 2020).

nonsevere, and Plaintiff's ability to meet physical, mental, sensory, and other work requirements. *See* 20 C.F.R. § 404.1545(a)(2), (4); *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of all impairments, 'even those that would not be considered severe in isolation.' "). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). And, importantly, although Plaintiff's statements of pain or other symptoms are considered, those statements alone do not constitute conclusive evidence of a disability. *Id*. § 404.1529(a).

As to physical abilities, the ALJ assesses the nature and extent of physical limitations, then determines the RFC for work activity on a regular and continuing basis. *See* 20 C.F.R. § 404.1545(b). A limited ability to perform physical demands, such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, or crouching may reduce the ability to do past and other work at step 5. *Id*.; *see also* SSR 96-8p, 1996 WL 374184, *5-6. After identifying Plaintiff's functional limitations and assessing her work abilities on a function-by-function basis, the RFC may be expressed by exertional category, such as "light" or "medium."[3] *Tenhove*, 97 F. Supp. 2d at 569; *accord Lechner*, 321 F. Supp. 2d at 1036; SSR 96-8p, 1996 WL 374184, *3. In order to do a full range of work contemplated by an exertional category, Plaintiff must be able to

---

[3]Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). While the weight lifted may be very little, a job is in the light work category "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id*. By contrast, medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id*. at § 404.1567(c).

perform substantially all of the functions at that level. *See* SSR 96-8p, 1996 WL 374184, *3.

Further, a limited ability to understand, remember, follow instructions, or respond to supervision, co-workers, and work pressures, may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. § 404.1545(c); *see also* SSR 85-15, 1985 WL 56857, *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.").

In the RFC, the ALJ must address medical source opinions. *See* SSR 96-8p, 1996 WL 374184, *7. If the RFC assessment conflicts with a medical source opinion, then the ALJ must explain why the opinion was not adopted. *Id.*; *accord Smith v. Colvin*, 9 F. Supp. 3d 875, 887 (E.D. Wisc. 2014). Medical opinions and prior administrative medical findings are considered based on: (1) supportability; (2) consistency; (3) the relationship with the claimant; (4) specialization; and (5) other factors supporting or contradicting the opinion, including evidence of familiarity with other evidence in the claim or an understanding of disability policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The most important factors to the persuasiveness of a medical opinion or administrative medical finding are supportability and consistency. *Id*. § 404.1520c(a), (b)(2).[4] The ALJ may, but is

---

[4]The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinions or prior administrative medical findings, the more persuasive they will be. 20 C.F.R. § 404.1520c(c)(1). The more consistent medical opinions or prior administrative medical findings are with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive they will be. *Id*. § 404.1520c(c)(2).

not required to, explain the other factors considered. *Id*. § 404.1520c(b)(2), (c)(3)-(5).

### III. The ALJ's Decision[5]

At step 1, the ALJ found Plaintiff had not engaged in substantial gainful activity since June 15, 2022. (Doc. 10-2, pg. 18). At step 2, the ALJ found Plaintiff had the following severe impairments: mental conditions variously diagnosed as generalized anxiety disorder, mood disorder, post-traumatic stress disorder, unspecified bipolar disorder, unspecified personality disorder with borderline personality traits, attention deficit hyperactivity disorder (predominantly inattentive type), borderline personality disorder, and mixed anxiety and depressive disorder; post-surgical correction of left bunion/hallux valgus deformity and mild osteoarthritis at the first metatarsophalangeal joint; and marijuana/cannabis dependence. (Doc. 10-2, pg. 18). These impairments significantly limited Plaintiff's ability to perform basic work activities. (Doc. 10-2, pg. 19).

At step 3, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the regulations. (Doc. 10-2, pg. 19). The ALJ specifically noted Plaintiff "walked with a minimal limp in a consultative examination," but "[o]ther examinations noted her to be ambulating normally." (Docs. 10-2, pg. 19; 10-7, pgs. 12, 115-118, 370). Further, the ALJ found Plaintiff satisfied neither the "paragraph B" nor the "paragraph c" criteria, stating:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. In an adult function report the claimant indicated that she had problems with remembering, concentrating, and following instructions. The claimant testified that she was a scatterbrain, starting

---

[5]When recounting the ALJ's decision, the Court independently verified the portions of the record that were cited by the ALJ. The Court also supplemented this section with its own supporting citations.

6

things, getting distracted and forgetting to come back to it. She said her memory was terrible. However, she was taking two classes per semester online toward a master's degree in counseling. In a consultative psychiatric examination, the claimant was alert and oriented to person, place, time, and situation. She was able to recall three of three objects. She recalled six digits forward and three digits backward. For recent memory, she recalled two out of three objects. For remote memory, she knew her date of birth, place of birth, and could name four past presidents. Her estimated intellectual functioning was average. Treating examinations noted her to be alert and oriented to person, place, and time, with intact memory, and average intelligence. As such, the evidence does not support more than moderate limitation in this area.

In interacting with others, the claimant has a moderate limitation. In an adult function report, the claimant indicated that she had problems getting…along with family, friends, neighbors, or others; only two of her six children delt [*sic*] with her. She had no contact with the other four children. She said she had never been fired or laid off because of problems getting along with others. People irritated her. The claimant testified that she tried to stay in her room because the people in her house were not doing things to help and she was tired of arguing with them. In a consultative psychiatric examination, the claimant made minimal eye contact. Treating examinations noted her to be cooperative and calm. As such, the evidence does not support more than moderate limitation in this area.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. In an adult function report the claimant indicated that she…found herself doing multiple things and not finishing anything. She could follow simple written instructions; if it was hard, she asked her daughter. The claimant testified that she started things, became distracted and forgot to finish them. However, she was enrolled in an online program taking two classes per semester toward a master's degree. She had an accommodation to allow her extended time for testing and for turning in assignments, but with that accommodation she could complete the work. In a consultative psychiatric examination, the claimant was able to spell 'world' backwards, count down from 20, perform three simple calculations, and complete serial 7s. The claimant received medication for attention-deficit hyperactivity disorder, primarily inattentive type, due to reports that she was running out of time doing tests because she tended to re-read the same sentence over and over. However, she was in a master's program at Missouri Baptist University and reported that she was doing better with accommodations that allowed her more time. Treating examinations did not find significant problems in this area noting her to have intact thought

process. As such, the evidence does not support more than moderate limitation in this area.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. In an adult function report, the claimant wrote that she was super depressed, so she did not get dressed but once or twice a week. She said she could bathe herself but had no desire to do it daily. She was not caring for her hair, indicating that it broke off. She noted that she ate a lot, or nothing at all, and brushed her teeth when visitors came. She did not need reminders to take care of personal needs she just had no desire to do so. The claimant testified that she tried to avoid things she did not think she was going to be able to finish. She did not want to be embarrassed. She was working with a client through the Department of Human Services helping her with housekeeping and simple meals. She said that the flexibility helped her to manager [*sic*] it[.] In a consultative psychiatric examination she appeared her stated age, her hygiene and grooming were fair. Insight and judgment were intact. The claimant saw a psychiatrist for medication management and began to see a therapist in July 2023. Although the claimant had an anxious or sad moods at time, her affect was congruent to her mood, treating examinations noted no significant problems in this area. During the relevant time period the claimant had no episodes of decompensation requiring urgent, emergent, inpatient or outpatient intensive behavioral health services. As such, the evidence does not support more than moderate limitation in this area.

(Docs. 10-2, pgs. 19-21, 37-58; 10-6, pgs. 31-38; 10-7, pgs. 119-126, 182, 186, 191, 196, 201, 206, 211, 216, 231, 235, 358, 363, 376) (internal citations omitted).

The ALJ observed that the mental RFC assessment required a more detailed assessment of the areas of mental functioning than is necessary under the "paragraph B" criteria. (Doc. 10-2, pg. 21). However, the ALJ stated the following RFC reflected the degree of limitation observed in the "paragraph B" mental function analysis:

After careful consideration of the entire record, I find that the claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform tasks requiring occasional operation of foot controls bilaterally. She can maintain the concentration required to understand, remember, and carry out simple and routine tasks. The claimant cannot work at a fast pace such as an

assembly line but can stay on task and meet reasonable production requirements in an environment that allows her to maintain a flexible and goal-oriented pace. She is limited to work that requires only occasional changes in the work setting which are introduced gradually and she can have occasional interaction with co-workers and supervisors. The claimant can have occasional superficial interaction with the public, such as providing limited information in response to questions but, the work must not involve things like handling customer complaints or responding to customer questions as a primary component of the job.

(Doc. 10-2, pg. 21).

The ALJ emphasized, when arriving at this RFC, she considered Plaintiff's symptoms and the extent to which they were reasonably consistent with the objective medical evidence and other evidence of record. (Doc. 10-2, pg. 21). The ALJ also indicated she considered the medical opinions and prior administrative medical findings. (Doc. 10-2, pg. 21). Finally, the ALJ stressed the two-step process for considering Plaintiff's symptoms, which included asking: (1) whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce pain or other symptoms; and (2) whether the intensity, persistence, and limiting effects of the symptoms limited Plaintiff's work-related activities. (Doc. 10-2, pg. 22).

Before discussing how the evidence supported the RFC, the ALJ summarized Plaintiff's reported symptoms, stating:

The claimant alleged disability due to major depressive disorder, generalized anxiety disorder, bipolar disorder-manic depression, borderline personality disorder, and post-traumatic stress disorder. In an adult function report completed in December 2022, the claimant wrote that her daily activities included cooking, cleaning, reading, writing, napping, playing with her dog and doll, spending time with her grandson and door dashing for money. She wrote that she was super depressed, so she did not get dressed but once or twice a week. She said she could bathe herself but had no desire to do it daily. She was not caring for her hair, indicating that

it broke off. She noted that she ate a lot, or nothing at all, and brushed her teeth when visitors came. She did not need reminders to take care of personal needs she just had no desire to do so. She wrote that she had no desire to do house or yard work but kept her toilet clean and her room maintained; her grown kids helped out at [*sic*] lot. She noted that she drove a car and forced herself to go out alone. She did Door Dash to care for herself. She indicated that she had problems getting along with family, friends, neighbors, or others; only two of her six children delt [*sic*] with her. She had no contact with the other four children. She indicated that her condition affected her ability to talk, hear, see, remember, concentrate, understand, follow instructions, and get along with others. She noted she had no desire to talk to or be around others. She tolerated her grandchildren. Her patience was bad, and she could not remember much of anything. She had scatterbrain and misunderstood directions and instructions when Door Dashing alone. People irritated her. She noted that she found herself doing multiple things and not finishing anything. She could follow simple written instructions; if it was hard, she asked her daughter. She said that she was not good with audible instructions and never had been[.] [S]he needed to write things down. She wrote that she did not get along well with authority figures, she was short fused and got fired for not following protocol. She said she had never been fired or laid off because of problems getting along with others. She wrote that she thought she handled stress well, but she had been struggling since 2020. She did not handle change in routine well. She said it was hard to learn a new way to do things[,] it was frustrating and took time. She said she did not like leaving her house, she did not feel safe, and she was anxious.

At the hearing, the claimant testified that she was not in any pain, and there were no physical impairments that prevented her from doing things around the house. She could stand for a few hours, and after a break she could stand for a few more. There were no chores that were difficult for her to do, although she was not as strong as she used to be. Her daughter did the shopping, she was traumatized from trying to be an Instacart shopper. She endorsed panic and panic attacks, saying she tried to avoid things that would create it. She quit working at Rally's because of panic. It was too overwhelming, so she quit. Co-workers were very hateful and did not embrace her needs well. They did not like her because she couldn't function. She showered or bathed three times a week. She struggled to remember to pay online bills without seeing a printed copy of the bill. She was a scatterbrain, she started things and got distracted, tried to come back to them but forgot. Her memory was horrible these days. Sometimes she spent days in bed. When things were overwhelming that was how she coped. She worked with a client through the Department of Human

services fourteen hours a week with a lady around the corner. She helped her with preparing frozen meals and keeping her place clean. There was no set schedule, so it worked for her. She had two clients but that was overwhelming. She started a master's program in 2022 when she stopped working. She took two classes per semester. She was studying to be an online counselor. She had accommodations for extended time on tests and extended time to turn in homework but with that accommodation she could do the work. She tried to avoid things that she did not think she was going to be able to finish. She did not want to be embarrassed.

(Docs. 10-2, pgs. 22-23, 37-58; 10-6, pgs. 5-12, 31-38).

The ALJ found Plaintiff's medically determinable impairments could reasonably cause these symptoms; however, Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical and other evidence. (Doc. 10-2, pg. 23). The ALJ summarized and explained the evidence as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of…her symptoms, they are inconsistent because medical evidence, including mental and physical exams and imaging, does not demonstrate the severity of limitations described by the claimant during the relevant period.
>
> Although the claimant testified that she has no difficulty with walking or standing, treatment records show a history of foot pain related to a left foot hallux valgus deformity. X-rays in July 2022 indicated a hallux valgus deformity and small bony excrescence at the medial first metatarsal head with mild osteoarthritis of the first metatarsophalangeal joint. Mild soft tissue swelling involving the left foot without definite evidence of acute displaced fracture or dislocation. In November 2022 the claimant had surgical correction of the bunion on her left foot. Treatment records in December 2022 indicated that the claimant was unable to follow up with her surgeon except for one visit. She reported mild pain in her foot, with no numbness or tingling. She indicated she had been on the foot a lot but had been wearing her post-op shoe. On examination there was mild swelling and mild pain, no acute signs of infection. Gross sensation was intact. She was assessed as doing well, and advised to stay in her post-op shoe until she could follow-up with her surgeon. This evidence supports a limitation to occasional operational foot controls bilaterally.

11

In January 2023 the claimant presented for a consultative physical examination. The claimant appeared her stated age and was in no apparent distress. She was alert and oriented to person, place, and time, memory appeared intact, fund of knowledge appeared normal. Her affect, dress, and hygiene were within normal limits, and she was cooperative during the examination. She walked with a minimal limp. She was able to walk 50 feet unassisted. She was able to tandem walk, and hop. She was not able to walk on her heels or her toes. She was able to squat. The left foot, especially over the big toe, was swollen and tender. All joints showed full range of motion. There was no muscle atrophy. There were no spasms. The claimant could oppose the thumb to each finger in both hands. Pinch strength, arm, leg, and grip strength were a full 5/5 throughout. She had no difficulties getting on and off the exam table. Sensation was within normal limits. There was no lower extremity peripheral edema. This evidence supports a limitation to occasional operation of foot controls bilaterally. Consistent with the claimant's testimony regarding her physical abilities, there is no support for exertional or additional physical limitation required by this examination.

In a July 2023 office visit with her primary care provider the claimant reported that she was on her feet at work 4-5 hours per day for the past three weeks. On examination the claimant ambulat[ed] normally with a normal gait and station and sensation grossly intact. The claimant reported that she had been working at Rally's fast food for three weeks and standing for a while. This evidence further supports the [RFC] above.

As to the claimant's mental health, the record supports no more than moderate limitations in mental function which are addressed by the [RFC] above. The claimant established care with a psychiatrist in May 2022 related to complaints of anxiety and depression. In a June 2022 visit to her psychiatrist, the claimant indicated she was stressed out due to work-related stress. An investigation was opened related to complaints of drug use. The claimant indicated that she was unable to complete an observed urine drug screen and ended up quitting her job. On examination the claimant was cooperative and calm, with clear fluent speech at a normal volume. She had no hallucinations and was alert and oriented to person, place, and time, with intact memory, insight, judgment and thought processes. She had average intelligence and a euthymic mood. The claimant was assessed with mood disorder, generalized anxiety disorder, cannabis dependence, and borderline personality disorder. She was prescribed medication and advised to stop cannabis. Of note, on the claimant's next visit in July, and in an initial appointment with a counselor in July 2023, the claimant reported that she was fired from her job for refusing to take a drug test.

Consistent with moderate limitations in mental function, the claimant continued to see her psychiatrist both in person and by phone for medication management. Treating examinations noted some changes in mood and affect but were otherwise unremarkable. The claimant was provided education on cannabis use disorder, including research that linked cannabis use with depression, social anxiety, and thoughts of suicide. The claimant was encouraged to stop using. She was assessed with attention-deficit disorder in October 2022 noting that she was attending Missouri Baptist University and taking psychology, she was in her first year and found she ran out of time doing tests because she tended to re-read the same sentence over and over. She was prescribed medication for attention-deficit hyperactivity disorder, predominantly inattentive type. No other medication changes were made. The claimant reported doing better in her classes with accommodations but continued to have low motivation. The claimant's satisfactory progress in her master's program with accommodations supports a limitation to work that is not fast paced, such as an assembly line, but she can stay on task and meet reasonable production requirements in an environment that allows her to maintain a flexible and goal-oriented pace. She can maintain the concentration required to understand, remember, and carry out simple and routine tasks.

In February 2023 the claimant presented for a consultative psychological exam and mental status evaluation. The claimant reported a history of three psychiatric hospitalizations, all for depression and suicidal threats, the most recent in 2013. The claimant was driven to the examination. She participated in the examination alone. She had difficulties during the evaluation based on ongoing high levels of crying which impacted her ability to interact. She was dressed casually; hygiene and grooming were fair. Her posture was tense. Motor behavior restless, eye contact was minimal. Her thought process was circumstantial. There was no evidence or history of hallucinations, delusions, or paranoia. The claimant denied any current or recent suicidal ideation, intent, or plan. Her mood and affect were depressed. She was alert and oriented to person, place, time, and situation.

On examination the claimant was able to spell 'world' backwards, count down from 20, perform three simple calculations, and complete serial 7s. For immediate memory, she recalled 3 out of 3 objects. The claimant recalled 6 digits forward and 3 digits backward. For recent memory, she recalled 2 out of 3 objects. For remote memory, she knew her date of birth, place of birth, and could name four past presidents. The claimant was able to explain proverbs and identify similarities between objects. Her estimated

intellectual functioning was average. Judgment and insight were intact. The examiner assessed post-traumatic stress disorder, unspecified bipolar disorder, and unspecified personality disorder with borderline personality traits. Although the claimant was noted to have difficulty with the examination due to crying, she was able to persist in performance of examination tasks. This evidence supports her ability to maintain the concentration required to remember, understand, and carry out simple and routine tasks.

Through the spring of 2023 changes were made to the claimant's medications to manage her mood and attention deficit disorder. Her psychiatrist continued to advocate for her to discontinue use of cannabis. Mental status examinations indicated fluent clear speech at a normal volume, no hallucinations, alert and oriented to person, place, and time, intact memory, insight, judgment, and thought process, average intelligence, and mood congruent with affect. In May 2023 the claimant reported that she had passed all of her classes but was feeling irritable with her present ADHD medication, changes were made. In June 2023 treatment notes indicated the claimant was stable, meeting goals, had a positive mindset, and was sleeping and eating well. This evidence is consistent with no more than moderate limitation in mental function and supports the limitations in the [RFC] above. The claimant's satisfactory progress in her master's program with accommodations supports a limitation to work that is not fast paced, such as an assembly line, but she can stay on task and meet reasonable production requirements in an environment that allows her to maintain a flexible and goal-oriented pace. She can maintain the concentration required to understand, remember, and carry out simple and routine tasks. The claimant's irritability reported with medication use is accommodated by a limitation to occasional interaction with coworkers and supervisors. She can have occasional superficial interaction with the public such as providing limited information in response to questions but, the work must not involve things like handling customer complaints or responding to customer questions as a primary component of the job. The claimant began to see a therapist in July 2023. She reported low confidence, feeling down at times, increased worry, increased panic symptoms at times, past trauma, and feeling overwhelmed with life stressors. She was currently in college and worried she would not complete the program. The claimant also felt that her marijuana use had impacted her behaviors and decisions. She got fired for refusing to take a drug test. The claimant reported having a problem with marijuana. She had a medical card for it and reported she was smoking it heavily in the past, but recently changed to the gummies and was trying to cut down. On examination she was well groomed, clean, and normal weight, cooperative, calm and eye contact. Her speech was

clear, fluent, and normal volume. She was alert and oriented to person, place, and time with intact memory, average intelligence. She was sad, with a sad, anxious, and tearful affect congruent to thought content. Insight, judgment, thought process and motor activity were intact.

In a follow up visit the claimant reported her mood had been mildly anxious due to her college classes. She felt inadequate and got anxious when in classes or when taking tests. She expressed that her confidence was low when it came to speaking up or asking questions. She was trying to make some positive behavior changes including going back to church and discontinuing her marijuana use. She felt those changes had helped and given her a better perspective. Of note, in a visit to her primary care provider the following day, the claimant reported that she was under the care of a psychiatrist and therapist, and not using any medication lately. She reported that she had stopped all use of cannabis as of that day. This evidence supports the social limitations set forth in the [RFC] above. To accommodate the claimant's anxiety, she is limited to work that requires only occasional changes in the work setting which are introduced gradually.

In a September 2023 visit with her psychiatrist the claimant was noted to be stable, meeting goals, with a positive mindset, eating and sleeping well. The provider noted that the claimant was working as a PA and enjoying it. The encounter was completed by phone, the claimant was instructed to continue her medications as prescribed and follow-up in three months. During the relevant time period the claimant has had no episodes of decompensation which required emergent or acute inpatient or intensive outpatient behavioral health treatment. She has been enrolled in a master's program and making adequate progress. Her symptoms appear to be adequately addressed by compliance with medication. This evidence is consistent with no more than moderate limitation in mental function and supports the [RFC] above.

(Docs. 10-2, pgs. 23-26, 37-58; 10-7, pgs. 70-72, 84, 115-126, 181-82, 186, 191, 196, 201, 206, 211, 216, 231, 235-36, 268, 358, 370, 376, 437, 440) (internal citations omitted).

Next, the ALJ explained that she could not defer, or give any specific evidentiary weight, to any particular prior administrative medical finding or medical opinion, even

15

if from medical sources. (Doc. 10-2, pg. 26). The ALJ summarized and explained her consideration of prior administrative medical findings and medical opinions as follows:

> State agency medical consultant, Vittal Chapa, M.D., provided prior administrative findings in February 2023, stating that the claimant could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours, and sit for six hours. This expert is generally well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act and Regulations. The consultant further supported the findings with significant explanation. However, the findings are inconsistent with some of the objective medical evidence, such as although the claimant had a minimal limp in her consultative examination two months after foot surgery, by July 2023 the claimant had a normal gait and station and ambulated normally. In her consultative examination she had full 5/5 strength throughout and a normal range of motion which is inconsistent with exertional limitations. For these reasons, these prior administrative findings are not very persuasive.
>
> On reconsideration in August 2023, Frank Mikell, M.D., found no exertional limitations. Although non-examining, the expert is well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act and Regulations. The findings were also well supported, providing a narrative explanation as well as significant references to the record. Further, the findings are consistent with the objective medical evidence, such as in a consultative examination the claimant had full 5/5 strength throughout and a normal range of motion. In a July 2023 examination the claimant indicated that she was on her feet at work 4-5 hours per day, on examination she ambulated normally with normal gait and station and intact sensation. For these reasons, the prior administrative findings on reconsideration are generally persuasive. However, I have added foot control limitations in order to avoid exacerbating any residual issues with the claimant's foot.
>
> Turning to opinion evidence, state agency psychological consultant, Steven Fritz, Psy.D., provided prior administrative findings in February 2023, stating that the claimant's mental impairments resulted in mild limitation in understanding, remembering, or applying information, moderate limitation interacting with others, mild difficulties in maintaining concentration, persistence, or pace, and mild limitation in adapting or managing oneself. On reconsideration in August 2023, Howard Tin, Psy.D., stated that the claimant's mental impairments resulted in mild limitation in understanding, remembering, or applying information, moderate

limitation interacting with others, moderate difficulties in maintaining concentration, persistence, or pace, and mild limitation in adapting or managing oneself. The consultants further provided findings as to the claimant's functioning, stating the claimant was capable of remembering work locations and general work related procedures, could perform and sustain tasks that require some skills but do not require complex duties, of a routine and repetitive type. The claimant retained sufficient attention and concentration to persist at and complete work activities for the usual periods required in the general work force. The claimant had the capacity for adequate pace and perseverance to maintain a schedule and on time attendance and had the capacity to complete a normal workday and work week on a regular basis. The claimant was able to perform at minimally acceptable rates requiring only the common frequency and lengths of rest breaks. The claimant would do best in a socially undemanding and restricted setting that required reduced interpersonal contact, away from the public. She could relate acceptably with a supervisor and coworkers to the minimally necessary degree. On reconsideration, the consultant additionally found that the claimant was limited to unskilled work because of her impairments. These nonexamining experts are generally well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act and Regulations. The consultant's findings were also well supported, with a narrative explanation as well as significant references to the record. However, the limitation to unskilled work was not supported by the consultant's findings that the claimant was not significantly limited in the ability to carry out either very short and simple or detailed instructions, not significantly limited in her ability to maintain attention and concentration for extended periods. Further, the findings are inconsistent with some of the objective medical evidence, such as the claimant was assessed with attention-deficit disorder and required accommodation in her classes for test taking. In a consultative examination she had difficulties during the evaluation based on ongoing high levels of crying which impacted her ability to interact. However, she was able to adequately interact and persist to complete exam tasks adequately, congruent with moderate limitation in concentration, persistence, and pace. The claimant was able to spell 'world' backwards, count down from 20, perform three simple calculations, and complete serial 7s. For immediate memory, she recalled 3 out of 3 objects. The claimant recalled 6 digits forward and 3 digits backward. For recent memory, she recalled 2 out of 3 objects. For remote memory, she knew her date of birth, place of birth, and could name four past presidents. The claimant was able to explain proverbs and identify similarities between objects. Treating examinations noted a sad or anxious affect at times, but cooperative, calm and eye contact. Her speech was clear, fluent, and normal volume. She was alert and oriented to person,

place, and time with intact memory, average intelligence. For these reasons, these prior administrative findings are not very persuasive.

Shea Voelker, Psy.D., a consultative psychiatric examiner authored an opinion in February 2023. He opined in the area of understand, remember, or apply information the claimant had a mild limitation based on mental status exam and symptoms reported. In the area of interaction with others the claimant had a marked limitation based on relational history[,] instability reported[,] and her interaction [during] her examination. In the area of concentration, persistence, and pace the claimant had a marked limitation based on symptoms reported and mental status evaluation. In the area of adapt and manage oneself the claimant had a marked limitation based on multiple psychiatric disorders, ongoing psychiatric symptoms that reportedly greatly impacted her functioning and had led to a decline in functioning. Based on the claimant's history of financial instability and impulsive spending, she may require assistance managing benefits. The author's examination did not support a marked limitation in concentration, persistence, and pace where the claimant was able to spell 'world' backwards, count down from 20, perform three simple calculations, and complete serial 7s. Further a marked limitation in interacting with others is not supported. While the consultative examiner noted that she cried and used minimal eye contact, she was nevertheless able to interact and to do well on testing, the examiner noted that she appeared to be a reliable informant. The opinion is inconsistent with other objective medical evidence including in a consultative medical examination the claimant appeared her stated age and was in no apparent distress. She was alert and oriented to person, place, and time, memory appeared intact, fund of knowledge appeared normal. Her affect, dress, and hygiene were within normal limits, and she was cooperative during the examination. The marked limitation in the area of adapting and managing oneself is inconsistent with treating examinations which noted a sad or anxious affect at times, but cooperative, calm and eye contact. Her speech was clear, fluent, and normal volume. She was alert and oriented to person, place, and time with intact memory, average intelligence. For these reasons, this opinion is not persuasive.

Balancing the claimant's function report and testimony (where she reported severe social limitations); with her interactions with providers (which generally noted her to be pleasant and cooperative, and where although she claimed social anxiety, she did not display significant social anxiety on exams such as tremulous voice, tearfulness, inability to focus); and her presentation at the consultative psychiatric examination, (where one may expect more significant symptoms due to the purpose of the exam and

18

detailed discussion of the claimant's mental history- which would not be the case in a work environment) moderate social limitations are supported and consistent. Similarly, balancing the claimant's testimony that her memory was horrible these days against her performance on memory tasks in her consultative examination, and treating examinations which found her memory intact, moderate limitations in memory give the claimant the benefit of the doubt. As to concentration, persistence, and pace, despite the claimant's testimony that she starts and does not finish tasks, moderate limitations are supported where the claimant performed well on persistence tasks in her consultative examination and with an accommodation to allow more time on testing and homework, the claimant was making adequate progress in a master's program in psychology. Moderate limitations in adapting and managing oneself are also supported and consistent with the claimant seeing a psychiatrist for medication management and a therapist. She had no episodes of decompensation which required emergent, urgent, inpatient, or outpatient behavioral health treatment.

Based on the foregoing, I find the claimant has the above [RFC] assessment, which is supported by the objective medical evidence. The claimant has a history of surgical repair of a bunion on her left foot. A limitation on operation of foot controls is warranted to avoid pain exacerbation. The record does not support exertional or other physical limitations. As for her mental health, the claimant sees a psychiatrist for medication management and a counselor for mental conditions which have been variously diagnosed as generalized anxiety disorder, mood disorder, post-traumatic stress disorder, unspecified bipolar disorder, unspecified personality disorder with borderline personality traits, attention deficit hyperactivity disorder, borderline personality disorder and mixed anxiety and depressive disorder and cannabis dependence. [E]xaminations noted issue with mood and affect but were generally within normal limits and note improvement in symptoms with medication compliance. A balance of the claimant's testimony and function report, consultative examination, and treating examinations support moderate limitation in mental functioning which is addressed by the [RFC]. In all, the record as a whole supports the [RFC] above.

(Docs. 10-2, pgs. 26-29, 37-58; 10-3, pgs. 7-17, 19-28; 10-7, pgs. 115-126, 182, 186, 191, 196, 201, 206, 211, 216, 231, 235, 358, 363, 376, 437, 440) (internal citations omitted).

At step 4, the ALJ found Plaintiff could not perform past relevant work, including work as a licensed practical nurse, a preschool teacher, and a social services aide. (Doc. 10-2, pg. 29). However, considering her age, education, work experience, and RFC, the ALJ found at step 5 there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Doc. 10-2, pgs. 30-32). The ALJ observed the vocational expert's testimony that, given those factors, Plaintiff could perform representative occupations at the medium exertional level with an SVP of 2. (Doc. 10-2, pg. 30). That included work as a kitchen helper (D.O.T. #318.687-010, with 400,000 jobs nationally), a hospital cleaner (D.O.T. #323.687-010, with 40,000 jobs nationally), and a stores laborer (D.O.T. #922.687-058, with 350,000 jobs nationally). (Doc. 10-2, pg. 30).

Based on the above analysis, the ALJ concluded Plaintiff was not disabled from June 15, 2022, through the date of her decision on July 8, 2024. (Doc. 10-2, pg. 32).

## IV. Analysis

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401

20

(1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about Plaintiff's alleged disability, and the ALJ's decision is supported by substantial evidence, then the Court will affirm the ALJ. *Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at 413). The Court reviews the entire record, but it does not reweigh the evidence, resolve conflicts, decide credibility, or substitute its judgment for that of the ALJ. *Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). With that said, though, an ALJ must build a logical bridge between the evidence and its conclusions. *Jarnutowski*, 48 F.4th at 773 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)); *but see Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) ("[A]n ALJ 'need not provide a complete written evaluation of every piece of testimony and evidence.' ").

Based on its review of the entire evidentiary record, and without reweighing the evidence, resolving conflicts in the evidence, deciding credibility, or substituting its own judgment for that of the ALJ, the Court finds it must reject Plaintiff's two arguments and hold the ALJ's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford*, 227 F.3d at 869; *Martin*, 950 F.3d at 373; *Jarnutowski*, 48 F.4th at 773; *Lopez*, 336 F.3d at 539.

First, Plaintiff argues her RFC is not supported by substantial evidence because the ALJ improperly evaluated the consultative psychological examination of Dr. Voelker. (Doc. 14, pgs. 10-17). Plaintiff states: "In discounting this opinion, the ALJ failed to explain why the substantial supporting explanations provided by Dr. Voelker did not support his opinion, and further selectively chose through the evidence ignoring the [objective and subjective] evidence highly supporting Dr. Voelker's opinion." (Doc. 14, pgs. 12-17).

Plaintiff further states: "The ALJ's error was harmful as the VE testified that marked limitations in the[] [three discussed] areas would be work preclusive." (Doc. 14, pg. 17).

Dr. Voelker's psychological examination/mental status evaluation, which was conducted on February 1, 2023, was based on a partial review of medical notes from Southern Illinois Healthcare Foundation that indicated mixed anxiety and depressive disorder. (Doc. 10-7, pgs. 119, 121). It was also based on historical information provided by Plaintiff, who "appeared to be a reliable informant." (Doc. 10-7, pg. 119). Plaintiff's chief complaints included depression, anxiety, bipolar disorder, borderline personality disorder, and posttraumatic stress disorder. (Doc. 10-7, pg. 119). Dr. Voelker summarized Plaintiff's history of presented problems in the following manner:

> The claimant reports that during childhood and adulthood, she has had ongoing chronic traumas. She stated this included her mother dying when she was 10 and her father being a pimp, as well as multiple traumas related to that. She endorses having ongoing daily flashbacks, increased hyperstartle responses, nightmares, hypervigilance, avoidance, intrusive thoughts, and anger outbursts. She states that she also feels that her current stressors have impacted her trauma symptoms including her son attacking her, a pitbull attacking her, and someone taking her wallet and stealing her identity. The claimant states that her depressive symptoms have been present since childhood. She stated that functionally she used to have longer stretches of ability to work and function at a decent level, and she states her longest time of functioning well and maintaining employment was from 1996 to 2001. She states that since that time, however, she has struggled and the last several years have been particularly difficult for her with her functioning. She states that her functioning is declining. She continues to struggle with depressive episodes. She reports having extremely depressed moods, crying spells that she cannot stop, excessive guilt, loss of interest, irritability, feeling keyed up and nervous, attention and concentration difficulties with "scrambled brain," diminished self-esteem, diminished sense of pleasure, and social withdrawal. Her sleep is impacted, and she requires trazodone. She reports an extremely fluctuating appetite and only marijuana assists it.

> The claimant endorsed that she will have at least three days where she does not sleep. She has excessive energy, excessive distractibility, pressured speech, flight of ideas, elevated mood, psychomotor agitation, increase in goal-directed activity, and a history of extreme impulsivity with three prior legal charges for Shoplifting during this period. She states that she has extreme relational instability in her past. She has been married three times and stated her relationships have always been problematic and "not healthy." She endorses impulsivity throughout her life, including going through $450,000 of inheritance quickly and losing her home due to impulsive spending at times. She has a history of making excessive suicidal threats. She stated she used to do this regularly. She feels she has mood instability. She feels chronic feelings of emptiness. She states that she has had extreme difficulties with anger modulation in the past. This has been both verbal, especially with family members, as well as, physical at times. She also endorses feelings of dissociation, and she states, "I have things that I just don't remember doing or going through." She states that she has multiple sides to her, some are provocative, some are studious, some sad, some happy. She states cognitively her focus is greatly worsening and her memory is worsening.

(Doc. 10-7, pgs. 119-121).

Dr. Voelker also noted, in 2010 and 2013, Plaintiff had three psychiatric admissions for depression and suicidal threats. (Doc. 10-7, pg. 121). Plaintiff was taking Wellbutrin, bupropion, and trazodone. (Doc. 10-7, pg. 121). And, as noted above, Plaintiff "report[ed] that she ha[d] a medical marijuana card and use[d] marijuana two to three times a day" to "help[] with appetite, mood, irritability, and sleep." (Doc. 10-7, pg. 121). She "attended at least ten years of college" and "was a nurse in the past." (Doc. 10-7, pg. 121). Plaintiff was in a master's degree program for counseling, but "[h]er grades were failing" because "she was struggling due to her psychiatric symptoms." (Doc. 10-7, pg. 121).

As to daily activities and functioning, as well as social history, Dr. Voelker noted:

> The claimant reports that her functional abilities have greatly declined based on her mental health symptoms. She states most days during depressive episodes, she does hardly anything. She stays in bed and rarely

leaves the house. She no longer cooks meals, cleans, does laundry or shopping. She has extreme difficulty keeping up with daily hygiene. She states due to all these factors, she is currently unhoused and living out of her car. She states historically with money management, she has made some impulsive spending, including ongoing credit card debt that she keeps racking up, and losing her home. She has a driver's license but does not drive. She states she…gets irritable and anxious when driving.

The claimant is divorced. She has been married three times. As stated, she is currently unhoused. She has six children total. The youngest is 17 years old. Socially, she reports ongoing extreme difficulties with all of her relationships. She states they have been unstable. She has had relational difficulties, irritability with them, made suicidal threats with them frequently. She states this all has impacted her jobs and all relationships including her children.

(Doc. 10-7, pg. 121).

During the examination and evaluation, Dr. Voelker observed as follows:

OBSERVATIONS AND MENTAL STATUS EXAMINATION: The claimant was driven to the examination. She participated in the examination alone. She had difficulties during the evaluation based on ongoing high levels of crying which impacted her ability to interact.

APPEARANCE: She was dressed casually. Hygiene and grooming were fair. Her posture was tense. Motor behavior was restless. Eye contact was minimal.

SPEECH: Intelligible. Expressive and receptive language adequate.

THOUGHT PROCESSES: Circumstantial.

THOUGHT CONTENT: No evidence or history of hallucinations, delusions, or paranoia. Suicidal and homicidal ideation: The claimant denied any current or recent suicidal or homicidal ideation, intent, or plan. She endorsed that in the past she has always made threats. She did have some historical instances where she used a dull knife on her wrists, which did not cause any physical damage. She denied any of what she would consider actual suicide attempts.

AFFECT: Depressed.

MOOD: Depressed.

SENSORIUM AND COGNITION:
ORIENTATION: Oriented to person, place, time, and situation.

Attention and Concentration: She was able to spell "world" backwards, count down from 20, perform three simple calculations, and complete serial 7s.

Recent and Remote Memory Skills: For immediate memory, she recalled 3 out of 3 objects. She recalled 6 digits forward and 3 digits backward. For recent memory, she recalled 2 out of 3 objects. For remote memory, she knew her date of birth, place of birth, and could name four past presidents.

Abstract Reasoning: Proverb interpretation: For "don't cry over spilled milk," she stated, "Let it go. It's done." Similarities: She stated an orange and a banana are both fruits.

Intellectual Functioning: Estimated intellectual functioning is average.

Insight: Intact.

Judgment: Intact. When asked what she would do if she discovered a fire in a crowded movie theater, she stated, "I am gonna run."

CLINICAL IMPRESSION:
F43.10 Posttraumatic stress disorder.
F31.9 Unspecified bipolar disorder.
F60.9 Unspecified personality disorder with borderline personality traits.

The claimant presents with a history of complicated psychiatric symptoms She has a history of chronic trauma- symptoms are clear with PTSD symptoms. Her borderline personality traits and potential hypomanic symptoms may overlap with each other. Thus at this time, borderline personality traits and unspecified bipolar disorder appear most appropriate. She also does have clear ongoing major depressive episodes with a reported extreme decrease in functional abilities. She currently is treated by a psychiatrist and has a history of three psychiatric admissions.

MEDICAL SOURCE OPINION: Vocational functional capacity is defined as the ability to function independently, appropriately, effectively, and on a sustained basis in each area below: Understand, remember, or apply information: Mild limitation based on mental status exam and symptoms

reported. Interaction with others: Marked limitation based on relational history instability reported and her interaction in today's examination. Concentration, persistence, and pace: Marked limitation based on symptoms reported and mental status evaluation. Adapt and manage oneself: Marked limitation based on multiple psychiatric disorders, ongoing psychiatric symptoms that reportedly greatly impact her functioning and have led to a decline in functioning.

CAPABILITY: Based on the claimant's history of financial instability and impulsive spending, she may require assistance managing benefit payments.

(Doc. 10-7, pgs. 122-124).

The Court agrees with Defendant that the ALJ properly considered this psychological examination and mental status evaluation. (Doc. 10-2, pg. 28) (citing 10-7, pgs. 115-126, 182, 186, 191, 196, 201, 206, 211, 216, 231, 235, 358, 363, 376). As recounted above, the ALJ disagreed with Dr. Voelker in the sense that a marked limitation in concentration, persistence, and pace was not supported because Plaintiff could spell "world" backwards, count down from 20, perform three simple calculations, and complete serial 7s. (Doc. 10-2, pg. 28). Similarly, the ALJ did not believe a marked limitation in interacting with others was supported because, despite Plaintiff crying and having minimal eye contact, she could interact, do well in the testing, and present herself as a reliable informant. (Doc. 10-2, pg. 28). And, critically, the ALJ explained with citations to the record that Dr. Voelker's opinion was inconsistent with the other objective medical evidence, including a consultative medical examination of Dr. Raymond Leung, where Plaintiff appeared her age, was in no apparent distress, was alert and oriented to person, place, and time, appeared to have an intact memory and normal fund of knowledge, had normal affect, dress, and hygiene, and was cooperative. (Doc. 10-2, pg. 28). Finally, the

26

ALJ explained with citations to the record that the marked limitation for adapting and managing oneself was inconsistent with treating examinations noting a sad or anxious affect because, otherwise, Plaintiff was cooperative, calm, maintained eye contact, had clear and fluent speech at a normal volume, was alert and oriented to person, place, and time with intact memory, and had average intelligence. (Doc. 10-2, pg. 28).

It was for these detailed reasons that the ALJ found Dr. Voelker's opinion unpersuasive, and it is not the Court's role to reweigh the evidence, resolve conflicts, decide credibility, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *Lopez*, 336 F.3d at 539; *see also Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (adding courts do not "resolve debatable evidentiary conflicts"). The ALJ, in view of the entire record, which was thoroughly summarized in her decision, drew a conclusion that was reasonable and substantially supported by the broader evidence. *See* 20 C.F.R. § 404.1520c(b) ("[W]hen a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis…. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually."); *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) ("[A]n 'ALJ need not…discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability."); *Hohman v. Kijakazi*, 72 F.4th 248, 251 (7th Cir. 2023) ("Our review, in short, is for substantial evidence—we reverse the ALJ's decision only if the record compels a contrary result.") (cleaned up).

27

Second, Plaintiff argues her RFC is not supported by substantial evidence because the ALJ improperly evaluated the opinion evidence on her physical impairments. (Doc. 14, pgs. 17-20). Plaintiff explains: "[T]he ALJ largely relie[d] on the 'opinion' from non-examining State agency review physician Frank Mikell, M.D., who the ALJ purported to opine that Plaintiff has no physical limitations. The problem here is that it is not apparent that Dr. Mikell rendered that opinion at all." (Doc. 14, pg. 17) (internal citations omitted). Since the ALJ relied on a "non-existent opinion" of Dr. Mikell, and also "played doctor" by rejecting the "light work" opinion of "non-examining State agency review physician Dr. Chapa[]" despite the findings of Dr. Leung and other evidence of "significant foot problems," Plaintiff argues the decision was not supported by substantial evidence. (Doc. 14, pgs. 17-19). And, again, Plaintiff argues "[t]he rejection of light work was harmful error, as Plaintiff was 55 years old on June 6, 2023, [so] a limitation to light work would have rendered her under the Medical-Vocational Guidelines." (Doc. 14, pg. 20).

Here, the Court again finds that the ALJ properly considered the evidence of Plaintiff's physical impairments for purposes of her RFC. As for the reconsideration findings from August 2023, which include findings of fact and an extensive analysis of the evidence of record on Plaintiff's mental and physical impairments, Dr. Mikell stated "non severe" in his medical evaluation. (Doc. 10-3, pgs. 20-22). Although a table listing indicates "Musculoskeletal System," "Disorders of Muscle, Ligament and Fascia," "Severe," which Defendant stresses is only a recounting of an initial-level finding, Dr.

28

Mikell did not specify any physical restrictions or limitations. (Doc. 10-3, pgs. 9, 22-28).[6] To the contrary, Dr. Mikell noted evidence reflecting Plaintiff ambulated normally, despite "persistent pain to L foot," and had only a "minimal limp." (Doc. 10-3, pg. 24).

Based on its review of Dr. Mikell's administrative medical findings, the Court agrees with Defendant that he did not specify any physical restrictions or limitations for Plaintiff. The ALJ believed Dr. Mikell's findings were well supported, as he provided a narrative explanation and significant references to the record. (Doc. 10-2, pg. 27). The ALJ also opined, with citations, that Dr. Mikell's findings were consistent with the objective medical evidence, including the consultative examination of Dr. Leung, where Plaintiff had full 5/5 strength and a normal range of motion. (Doc. 10-2, pg. 27) (citing Doc. 10-7, pgs. 115-119). In another examination from July 2023, the ALJ noted Plaintiff was on her feet at work 4-5 hours per day and, on examination, she ambulated normally. (Doc. 10-2, pg. 27) (citing 10-7, pgs. 437, 440). She had normal gait and station with intact sensation. (Docs. 10-2, pg. 27; 10-7, pg. 441). Clearly, the ALJ adequately explained why these prior administrative medical findings were "generally persuasive," and it was not erroneous on this record to "add[] [a] foot control limitation," beneficial to Plaintiff, "to avoid exacerbating any residual issues with the claimant's foot." (Doc. 10-2, pgs. 23, 27, 29).

Similarly, contrary to Plaintiff's position, the ALJ adequately explained why Dr. Chapa's initial-level prior administrative medical findings were rejected as "not very persuasive." (Doc. 10-2, pgs. 26-27) (citing Doc. 10-7, pgs. 115-119, 440). Although Dr.

---

[6]It is also true Dr. Mikell's prior administrative medical findings include the reference "unskilled light," but Plaintiff omits the date included with that reference, "02/21/23," which was the date of the initial-level prior administrative medical findings. (Doc. 10-3, pgs. 16, 21).

Chapa found Plaintiff "could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours, and sit for six hours," as well as "supported th[ose] findings with significant explanation," the ALJ believed the findings were inconsistent with some of the objective medical evidence. (Doc. 10-2, pgs. 26-27). Specifically, the ALJ explained that Plaintiff had a minimal limp in her consultative examination two months after foot surgery, but she had normal gait, station, and ambulation by July 2023. (Doc. 10-2, pgs. 26-27). Further, as discussed above, Plaintiff had full 5/5 strength and a normal range of motion in another consultative examination, which was inconsistent with exertional limitations. (Doc. 10-2, pg. 27). And, again, it was proper to accept Dr. Mikell's opinion, but not Dr. Chapa's opinion, as "generally persuasive," and to proceed based on the record to "add[] [a] foot control limitation," beneficial to Plaintiff, "to avoid exacerbating any residual issues with the claimant's foot." (Doc. 10-2, pgs. 23, 27, 29). The Court will not reweigh the evidence. The ALJ's conclusion, in view of the whole record, was reasonable and substantially supported.

## V. Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: March 30, 2026.

s/ *David W. Dugan*

DAVID W. DUGAN
United States District Judge

30